IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

EMPOWER ANNUITY INSURANCE COMPANY OF AMERICA, a Colorado corporation,

     Plaintiff,

v.

EMPOWER FINANCE, INC.,

     Defendant.

---

**COMPLAINT FOR TRADEMARK INFRINGEMENT,
UNFAIR COMPETITION AND DECEPTIVE BUSINESS PRACTICES**

---

Plaintiff Empower Annuity Insurance Company of America ("Empower"), through its counsel, states and alleges as follows against Defendant Empower Finance, Inc. ("EF"):

## NATURE OF ACTION

1.      This is an action for federal trademark infringement under the Lanham Act of 1946, as amended, 15 U.S.C. §§ 1114 *et seq.*, federal unfair competition under 15 U.S.C. § 1125(a)(1)(A), common law trademark infringement and unfair competition under Colorado law, and deceptive business practices under Colo. Rev. Stat. § 6-1-105.

## PARTIES

2.      Empower is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in Greenwood Village, Colorado.

3.      Empower is a leading provider of financial products and services in the United States, as discussed in detail in paragraphs 19-49.  Empower is also the owner of the www.empower.com domain name.

4.      On information and belief, EF is a company organized and existing under the laws of the State of Delaware, with its principal place of business in San Francisco, California.

5.      On information and belief, EF is also a provider of financial products and services.

## JURISDICTION AND VENUE

6.      The first and second Claims for Relief arise under the Lanham Act of 1946, as amended, 15 U.S.C §§ 1051 *et seq*.  This Court has jurisdiction over these Claims under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1131 and 1338(a).

7.      The third through fifth Claims for Relief arise under Colorado statutory and common law.  This Court has jurisdiction over these Claims for Relief under 28 U.S.C. § 1338(b) in that these claims are joined with substantial and related claims brought under the laws (15 U.S.C. §

1114 *et seq.*) of the United States.  This Court also has jurisdiction over these Colorado state law claims under the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, because the federal and state claims are based on the same operative facts, and judicial economy, convenience, and fairness to the parties will result if this Court assumes and exercises jurisdiction over the state law claims.

8.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the jurisdictional amount exceeds $75,000, and Empower and EF are citizens of different states.

9.     This Court has specific personal jurisdiction over EF due to its purposeful acts, transactions and business relationships within and directed toward the State of Colorado, which give rise to Empower's claims for relief and have resulted in harm to Empower within Colorado.

10.     Empower is informed and believes, and thus alleges, that EF markets and sells its infringing products and services, as described in paragraphs 61-69, in and to consumers in the State of Colorado, including through the use of telemarketing, text messages, and other advertising campaigns directed specifically at Colorado residents, as discussed in further detail in paragraphs 74-84.

11.     Empower is informed and believes, and thus alleges, that EF contracts with third parties to provide consumer deposit accounts to residents of Colorado.

12.     EF's infringing products and services have resulted in significant actual confusion which has harmed Empower within Colorado, including by diverting significant resources located in Colorado, and harming the reputation in which Empower has invested significantly.  Examples of such confusion are discussed in further detail at paragraphs 70-73.

13.     Empower is informed and believes, and thus alleges, that EF contracts with third parties to provide hundreds of "in-network" ATMs physically located in Colorado, as discussed in further detail in paragraphs 80-82.  Upon information and belief, these ATMs are intended for use by

Colorado residents and others located physically within the State of Colorado to conduct transactions using their EF accounts. EF promotes and provides information on these in-network Colorado ATMs through both its website, located at https://empower.me, and mobile app which is called "EMPOWER."

14.    Empower is informed and believes, and thus alleges, that EF deposits funds to, and withdraws funds from, bank accounts located in the State of Colorado and owned by consumers residing in Colorado.

15.    In April 2021, EF entered into an agreement ("the April 2021 Agreement") with Empower through which the parties undertook continuing obligations "[f]rom the Effective Date of th[at] Agreement," regarding how they would use the mark EMPOWER and reserved their rights, including for future enforcement if there should be a likelihood of confusion.

16.    EF and Empower had numerous discussions through their lawyers, as well as discussions involving individuals located in Colorado prior to entry into the April 2021 Agreement. EF entered into this agreement with Empower with full knowledge that Empower's principal place of business was in Colorado.

17.    On December 16, 2022, through its lawyers, EF contacted Empower to demand renegotiation of the parties' continuing obligations under the agreement.

18.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because EF is subject to personal jurisdiction in this District, and because a substantial part of the events or omissions giving rise to Empower's claims occurred in this District.

## ALLEGATIONS OF FACT

### *Empower and the EMPOWER Marks*

19.  With a history tracing back to 1891, Empower is the second-largest retirement plan provider in the United States.  Empower supports the savings and investments of more than 17 million customers and helps over 70,000 organizations administer more than $1.2 trillion in plan assets.

20.  Empower offers a myriad of financial services and related products to individual customers throughout the United States, including in Colorado.  These include retirement and investment products and services, personal finance and portfolio management products and services, and advisory and educational resources.

21.  Empower's retirement and investment products and services include two IRAs: the Empower Premier IRA and Empower Brokerage IRA, as well as the Empower Investment Account.

22.  The Empower Premier IRA is an advisor-managed portfolio, with the Empower Brokerage IRA marketed towards more knowledgeable investors who prefer to manage their own portfolios.

23.  The Empower Investment Account provides individuals access to commission-free online trading of stocks and exchange-traded funds ("ETFs"), as well as allows individuals to take advantage of unlimited funding so they can invest to meet financial goals without worrying about investment limits.  A website snip from empower.com of Empower's Empower-branded retirement and investment offerings for individual consumers is included as Figure 1, below.



*Figure 1: Empower's Empower-Branded Retirement and Investment Offerings For Individual Customers, As Displayed On empower.com*

24.    Empower also offers personal finance and portfolio management products and services, including through Empower Private Client Solution, Empower Advisory Services and Empower's My Total Retirement product, as well as an associated personalized dashboard.

25.    Empower Private Client Solution provides individuals with a customized managed portfolio and team to monitor and manage individuals' investments and assets according to an individualized strategy aligned with personal financial goals, and including with respect to tax optimization, legacy and estate planning consultation, and access to private equity.

26.    Empower Advisory Services assists employers and plan sponsors in meeting their fiduciary obligations as well as provides tailored solutions to individuals to help meet their financial goals.

27.    And Empower's My Total Retirement product pulls real-time data from all of a participant's income sources, savings and investment accounts, integrating those factors with

demographic data into a planning experience using the input of investment professionals and Empower proprietary technology, blending a traditional retirement managed account with a digital and mobile multi-touch experience. These services integrate with Empower's personalized dashboard, which displays an individual's full financial picture including savings, income, assets, spending and debt, as well as student loan debt guidance. An image of Empower's personalized dashboard is included as Figure 2.

*Figure 2: Empower's Personalized Dashboard, As Displayed On A Desktop, Tablet And Mobile Phone*



28.    Empower additionally provides advisory and educational resources, including through Empower Insights, Empower Institute, and the Empower Wellness and Financial Center.

29.    Through Empower Insights, Empower publishes tips, articles and solutions designed to assist individuals in reaching their financial goals, with topics ranging from social security, mortgage rates and student loans to open enrollment, the housing market, the financial implications of major life events and estate planning.

30.    The Empower Institute aims to analyze and address the challenges and opportunities at the forefront of the American retirement landscape, providing insights and articles relaying its findings.

31.    And the Empower Wellness and Financial Center offers educational resources on a variety of topics, including financial budgeting, investing, estate planning, managing taxes, saving for the future, and financial considerations around life decisions such as marriage, having children, and transitioning to retirement.  An image of the Empower Wellness and Financial Center taken from empower.com is included as Figure 3.

*Figure 3: Empower Wellness And Financial Center*



32.    Empower's products and services are available online and can be accessed by participants via Empower's web-based platform, website, and also mobile application.

33.    Empower's mobile application, titled "EMPOWER," provides full account functionality, allowing customers to manage all their Empower accounts, including retirement plans, investment accounts and HSAs, in one place.

34.    Through the EMPOWER app, customers can make changes to their investment choices and contribution rates, as well as monitor the performance of their portfolio.

35.    The EMPOWER app also displays account balances, breakdowns of contributions to a customers' accounts, and customers' financial goals and progress.  It can also provide customers with comprehensive yearly snapshots of their accounts.  Screenshots of this functionality taken from the Apple App Store are included at Figure 4.



*Figure 4: Screenshots of Empower App Functionality*

36.    Empower has been operating under the "EMPOWER" brand since at least as early as 2014, long prior to any use by EF of a mark containing the term EMPOWER, and is the owner of

a family of EMPOWER marks, including numerous EMPOWER and EMPOWER-formative federal registrations covering its products and services.

37.    Empower owns federal registrations (the "EMPOWER Registrations") for the following



trademarks incorporating the term EMPOWER:                    (U.S. Reg. No. 5407837), (U.S. Reg. No. 5256647), (U.S. Reg. No. 5743480), EMPOWER HEALTH SAVINGS ACCOUNT (U.S. Reg. No. 6216958), EMPOWER HSA (U.S. Reg. No. 6064550), EMPOWER SELECT (U.S. Reg. No. 6043302), EMPOWER DYNAMIC RETIREMENT MANAGER (U.S. Reg. No. 6064551), EMPOWERUP (U.S. Reg. No. 6053841), (U.S. Reg. No. 6053897), and (U.S. Reg. No. 6053898). Copies of the Certificates of Registration issued by the United States Patent and Trademark Office ("USPTO") for the EMPOWER Registrations are attached as **Exhibit A**. These marks are registered in connection with various financial services, including financial record keeping, financial administration of pension and retirement plans, investment and retirement fund management, and mutual fund investment services.

38.    Empower also owns Colorado State Trademark Registration No. 20228290612 for EMPOWER (the "Colorado State Registration").  A copy of the corresponding Statement of Trademark Registration of a Reporting Entity is attached as **Exhibit B**.

39.    Empower additionally holds common law trademark rights in the marks which are the subject of the EMPOWER Registrations and Colorado State Registration, as well as other EMPOWER and EMPOWER-formative marks, including but not limited to, EMPOWER INSTITUTE, EMPOWER PREMIER IRA, EMPOWER BROKERAGE IRA, EMPOWER

INVESTMENT ACCOUNT, EMPOWER PRIVATE CLIENT SOLUTION, EMPOWER INSIGHTS, EMPOWER ADVISORY SERVICES, EMPOWER BENEFIT CONSULTING SERVICES, EMPOWER WELLNESS AND FINANCIAL CENTER, EMPOWERING AMERICA'S FINANCIAL JOURNEY and EMPOWER alone (collectively "EMPOWER Common Law Marks"). These marks are used in connection with a variety of financial products and services overlapping with and/or closely related to the financial services associated with the EMPOWER Registrations, including but not limited to personal financial planning, individual financial advising, account tracking, policy insights, and actuarial consulting, including as described in paragraphs 20-35 above.

### Recognition and Renown of the EMPOWER Brand

40.    Empower has developed an enduring reputation and legacy of goodwill in the EMPOWER marks (the EMPOWER Registrations, Colorado State Registration, and EMPOWER Common Law Marks are collectively referred to herein as the "EMPOWER Marks"), and which the relevant consuming public, including in Colorado, has come to recognize and associate exclusively with the EMPOWER Marks, Empower, and Empower's financial products and services.

41.    Empower has invested over $50 million in the United States alone, including in Colorado, promoting its EMPOWER-branded products and services on television, radio, online and print advertisements, brand sponsorships, and the operation of a U.S. website located at www.empower.com/.

42.    In 2019, Empower secured a 21-year naming rights deal for the home stadium of the Denver Broncos, a venue which hosts many of the biggest games, concerts and events every year,

and on which the EMPOWER mark is proudly emblazoned, inside and out. Representative images are included at Figure 5.

*Figure 5: Empower Field at Mile High*





43. In 2020, Empower launched its "Empower Retirement: Focus on today. Save for tomorrow." national television advertising campaign, which saw commercials air on Fox Business, CNBC, Bloomberg, ESPN, ESPN2, and the Golf Channel. *See* Figure 6. Empower also launched a corresponding promotional campaign which aired on National Public Radio.



*Figure 6: Screengrab from Empower Advertising Campaign*

44. Empower currently sponsors several world-class athletes, including legendary Denver Broncos safety and Pro Football Hall of Famer Steve Atwater, Ladies Professional Golf Association ("LPGA") Tour champion Cheyenne Knight and golfer Mariah Stackhouse, Professional Golfers' Association ("PGA") Tour champion Brendon Todd, and PGA Tour golfers Davis Riley, Webb Simpson, Robert Streb, and Brendan Steele. Images of these athletes wearing

Empower-branded apparel and appearing in Empower content are included at Figures 7 and 8,

below.

| *Figure 7: Sponsored Athletes Stackhouse and Riley Wearing Empower-Branded Apparel* | |
|---|---|
|  |  |

| *Figure 8: Empower Partner and Former Denver Broncos Safety*<br>*Steve Atwater In Video For Empower* |
|---|
|  |

45.     Additionally, Empower has partnered with three National Football League ("NFL") teams: the Denver Broncos, the Kansas City Chiefs, and the New England Patriots, on marketing campaigns including naming rights, in-stadium branding and signage, media advertising, sponsorship of team alumni events, and access to playoff games and offseason NFL events. Empower also sponsored the New England Revolution, a Major League Soccer ("MLS") team. And Empower currently holds a marketing partnership with Boston College, enjoying digital and social media opportunities, radio, in-stadium branding, signage and hospitality benefits in exchange for its support of the university's student athletes in football, basketball and hockey.  *See* Figure 9.

*Figure 9: Empower In-Stadium Branding at Boston College's Conte Forum*



46.     Empower has also partnered with The Economist to publish a series of co-branded white papers aimed at improving relationships between employees and their employers for greater

financial success. And Empower also produces an annual study: Empowering America's Financial Journey, analyzing the behavior of approximately 4.3 million active defined contribution ("DC") participants to better understand their savings habits and retirement planning goals. Empower has received significant national media coverage resulting from this study, including articles in *The New York Times*, Bloomberg, Yahoo, and PLANSPONSOR, among others.

47.    Empower has been recognized in the financial services industry for the quality of its services. Empower earned 28 "Best in Class" ratings from plan sponsors in the 26th annual PLANSPONSOR DC Survey, in key areas including plan design flexibility, online financial wellness offering, website, reporting tools, and fee value and transparency. In 2022, the Financial Advisor IQ Service Awards, derived from a survey of more than 900 financial advisors, acknowledged Empower in six categories: "Best Participant Tools," "Best Reporting," "Best Price," "Best Cybersecurity/Privacy," "Best Client Service," and "Best Overall." A list of these recognitions and representative articles noting them are attached at **Exhibit C**.

48.    As a result of Empower's numerous sponsorships and partnerships, as well as its extensive sales, advertising, marketing, promotional efforts and varied awards and achievements, the EMPOWER Marks have become well-known and recognized by the relevant consuming public throughout the United States, including in Colorado, and serve as a source-identifier for Empower and its high quality, trustworthy financial products and services.

49.    Given the nature of Empower's products and services, the significant financial contributions that customers make in such products and services, and the importance of consumer confidence when offering financial products and services, the goodwill associated with the EMPOWER Marks is critical for maintaining trust and confidence in Empower's products and services.

### *EF Enters the Market as an Informational Mobile Application*

50.    In May 2017, EF launched as a mobile application collecting data from individual bank and credit card accounts and offering general recommendations to improve overall financial health. Examples of such advice included how to improve your credit score and providing information on average auto insurance rates in order to negotiate lower prices.  At that time, EF did not allow users to create checking or savings accounts through EF, and it did not provide investment advice. EF's goal, at launch, was to "help millennials better manage their finances."  *See* **Exhibit D**.

51.    Up until at least June 2018, EF promoted itself as a "24/7 online personal financial assistant" and "money management application helping people better track their finances and investments."  EF CEO Warren Hogarth stated that EF "was created to bring all your finances under one app and help you better understand your money and build wealth."  *See* **Exhibit E**.

52.    And in June 2018, EF appeared focused on an expansion into the cryptocurrency space, announcing a cryptocurrency exchange integration into its app, and a cryptocurrency leaderboard that would "showcase[] users performance and rankings amongst others in the Empower crypto community."  *Id.*

53.    In the same month that EF launched its mobile application, Empower contacted EF, expressing concern over its uses of EMPOWER and EMPOWER FINANCE and placing EF on notice of Empower's superior rights in those marks.  Empower then warned EF that the parties "may be marching towards each other in the marketplace," that "[t]ime will tell what level of actual or likely confusion exists or develops," and that it would be "vigilantly monitoring the situation." Empower expressly reserved all of its rights.

54.    Between 2017 and 2021, the parties continued to exchange correspondence and communications, including directly between EF CEO Warren Hogarth and Colorado-based

Empower employees, relating to Empower's concerns over EF's use of EMPOWER and its encroaching expansion of offerings in the financial services space.

### *EF Files For – And Withdraws – EMPOWER Trademark Applications*

55.    On July 2, 2019, EF filed the following trademark applications with the USPTO (collectively, the "EF Applications"):

- U.S. App. Ser. No. 88498335 for the mark Empower ≫ in connection with "personal credit and lending services, namely, providing personal loans and lines of credit; credit card services, namely, issuing credit cards, payment processing, and transaction processing"; and

- U.S. App. Ser. No. 88975888 for the mark Empower ≫ in connection with "downloadable software for use in electronically managing personal financial transactions, budgets, and payments; downloadable computer software for online personal banking, transaction management, financial planning, financial management, bill tracking, and expense tracking; downloadable and recorded computer software for providing banking, financial, and payment alerts; downloadable computer software for enabling users to retrieve personal financial account balances and financial transaction information via a mobile application; cash management services, namely, personal budgeting services; online personal banking services; financial consulting services using both human and machine learning intelligence; financial information provided by electronic means in the field of finance, budget and spending reporting; providing financial services alerts, reports, transactions, and decision-making information using AI technology; personal financial transaction services, namely, budget planning in the nature of transaction tracking."

56.    Empower opposed the EF Applications before the Trademark Trial and Appeal Board ("TTAB") ("Empower Oppositions") on the grounds that those applications created a likelihood of confusion with certain of the EMPOWER Registrations and EMPOWER Marks.

57.    EF elected to withdraw the EF Applications.  As a result, the EF Applications were abandoned by EF following the Empower Oppositions, and EF has not since filed any trademark applications incorporating the EMPOWER mark.

58. Contemporaneously with the abandonment of the EF Applications, EF entered into an agreement with Empower under which both parties expressly reserved all rights, including with respect to any future potential actual confusion, but also agreed to undertake certain continuing obligations.

59. On December 16, 2022, EF wrote to Empower confirming the parties had agreed to "postpone[] any resolution of the potential confusion that might arise from [the parties'] respective uses of their Empower-formative marks" and stating that EF wanted to "re-engage in [] discussions."

60. While Empower has at every turn sought to resolve this dispute amicably, due to the growing evidence of actual confusion that Empower has more recently received as a direct result of EF's encroachment into Empower's field of use, much of which is reputationally damaging as well as harmful to consumers, Empower filed the instant action.

*EF Continues Expansion, Resulting in Increased Consumer Confusion and Complaints*

61. Since its 5-person launch in 2017, EF has sought to redefine its services contemporaneously with various rounds of private equity funding. It launched in 2017 with an undisclosed amount of seed funding from investors. In March 2020, it received $20 million of Series A funding. And it recently closed $150 million in Series B funding in September 2022. *See* **Exhibit F**. EF's Series A and Series B funding have fundamentally transformed the scope and nature of its business.

62. Following its Series A funding, on March 5, 2020 EF issued a press release referring to itself as "Empower" and describing its business for the first time as follows:

> Empower's instantaneous digital intelligence is complemented by human coaching to guide customers through more difficult or unique financial challenges Millennials face, **including planning for retirement**…

*See* **Exhibit G** (press release announcement from EF) (emphasis added).

63.   In 2020, EF also launched "Empower Cash Advance": a new service offering pre-payday cash lending of up to $250 to be repaid automatically through a user's next paycheck deposit.  An image taken from empower.me displaying EF's Empower Cash Advance offering is included at Figure 10.

*Figure 10: EF's "Empower Cash Advance" Offering*



64.   While EF claims that Empower Cash Advance is not a payday loan, EF describes this service as "your money coming to you before payday," and directs this service at consumers who are "strapped for cash," noting "Empower will float you up to $250 when you need it most… Just pay us back when you get your next paycheck."  Examples of EF's advertising of its Empower Cash Advance product are included at Figure 11.



*Figure 11: EF's Advertising of Empower Cash Advance*

65.     And while EF advertises its Empower Cash Advance product as charging "no interest," it does charge users $8/month, or $96 annually, for the ability to obtain a cash advance of *up to* $250.

66.     In May 2022, EF announced a new offering, "Empower Thrive," which purports to offer a revolving line of credit. EF has indicated Empower Thrive will be launched in the first quarter of 2023, and currently features it as "coming soon" on its homepage. An image taken from empower.me displaying EF's Empower Thrive offering is included at Figure 12.



*Figure 12: EF's "Empower Thrive" Offering*

67.    While EF advertises Empower Thrive as offering "0% APR," the fine print indicates Empower will in fact charge consumers **35.99% APR** on any balance not paid by a user's next paycheck date.

68.    In connection with these vastly expanded products and services, EF has evolved its online presence to focus on the EMPOWER mark.  For example, EF initially used the Twitter handle @_empowerfinance in 2017 to promote its products and services.  In 2018, EF changed its Twitter handle to @empowermeapp.  Now, EF uses the handle @EmpowerHQ, and refers to itself as Empower in its title card.  EF also refers to itself as Empower on its LinkedIn page, TikTok (with the handle @empower), Facebook profile (with the handle @EmpowerHQ), and as @empowerhq on Instagram.  Images of EF's social media handles taken from EF's respective accounts are included at Figure 13.



Figure 13: EF's Current Social Media Presence

69.   Through, among other things, the continued expansion of EF's products and services, including into the area of retirement planning, as well as its increased use and emphasis of the EMPOWER mark, EF has impermissibly encroached on Empower's rights in the EMPOWER Marks, offering products and services that confuse and potentially mislead consumers and harm Empower's reputation, including in Colorado.

70.    This more recent encroachment has led to dozens of reported instances of actual consumer confusion.

71.    In one example, an EF customer contacted Empower, asking "**why we were taking $8 a month out of his checking account**."  In another, an EF customer contacted Empower, "**wanting 'Empower Inc.' to stop pulling money out of her checking account**."  In yet another example, an Empower customer contacted EF seeking her 1099, and providing personal identifying information for that purpose.  And in yet another example, a consumer recently contacted Empower regarding over $450 in debits from her bank account over two consecutive days (including a charge for $250, specifically), at least one of which appeared on her bank statement as originating from "Empower Advance San Francisco, CA."

72.    Many of these instances of confusion have resulted in angry customers, concerned about unknown charges and withdrawals from their bank accounts, often resulting from their mistaken download of EF's app instead of Empower's app.  In their confusion, customers have also shared sensitive personal information, such as their social security numbers, dates of birth, address and account numbers with the incorrect company.

73.    The actual consumer confusion generated by EF's use of the EMPOWER Marks has also diverted significant resources away from Empower's customer service and fraud departments which have a substantial presence in Colorado, and which have been required to address the results of this confusion and associated reputational harm.

### *EF Builds Ties To Colorado And Targets Colorado Consumers Specifically*

74.    On information and belief, and as it has expanded its products, services and use of EMPOWER, EF has also expanded and directed its marketing, advertising, and provision of services to Colorado residents specifically.

75.    For example, Empower is informed and believes, and thus alleges, that EF has conducted telemarketing activities in Colorado, including through the use of Denver-area telephone numbers which appear to, but do not, originate from Empower.

76.    In an exemplary instance, a Colorado resident received three calls on three consecutive days on her Colorado phone line from a number with a Denver area (303) area code, and which caller ID identified as "Empower."  When the Colorado resident answered the third such call, she was informed her "**cash advance had been approved**."

77.    Empower is informed and believes, and thus alleges, that EF was the source of this telemarketing call and other similar telemarketing activities targeting Colorado residents specifically.

78.    EF also intentionally markets and provides its infringing EMPOWER-branded products and services in Colorado and to Colorado residents specifically.

79.    On information and belief, EF sends text messages to Colorado-area telephone numbers, marketing its various Empower-branded products and services specifically to residents of Colorado.  In sending these marketing text messages, EF refers to itself as "Empower."

80.    On information and belief, EF also contracts with third parties for the provision of ATM services, through which EF customers are able to conduct transactions utilizing EF accounts.

81.    EF describes these ATMs as "in-network" for its customers, and provides a link via its website and mobile app to an "ATM finder" for customers to locate ATMs within specified geographic boundaries.  *See* **Exhibit H**.

82.    That ATM finder identifies at least 100 such "in-network" ATMs in the Denver, Colorado, area alone, with hundreds located across the state more broadly, and which ATMs are intended for use by Colorado residents and others located physically within the State of Colorado

to conduct transactions using their EF accounts.  *See* **Exhibit I**, listing hundreds of "in-network" ATMs located in and around the five most populous cities in Colorado, and Figure 14, displaying those ATMs in the Denver, Colorado area, specifically.

*Figure 14: Map Showing EF's "In-Network" ATMs in Denver, Colorado Area*



83.     On information and belief, EF also deposits funds to and withdraws funds from bank accounts located in Colorado, and belonging to residents of Colorado.

84.     Upon information and belief, EF has sold, offered to sell, promoted and/or marketed personal finance and financial planning products and services under marks which are confusingly similar to the EMPOWER Marks, including in Colorado.

85.     Upon information and belief, EF deliberately selected "Empower" for its products and services, over time expanding its branding, products and services progressively closer to those of

Empower, in an effort to trade off of the goodwill, reputation and success of Empower, the EMPOWER Marks and Empower's products and services.

86.    EF has no permission or authority from Empower, directly or indirectly, to utilize the EMPOWER Marks, or to license others to do so.

87.    For the reasons detailed above, EF's activities infringe Empower's rights in the EMPOWER Marks, constitute unfair competition and deceptive business practices against Empower, and give rise to the claims set forth below.

<u>**COUNT ONE**</u>
***Federal Trademark Infringement***
15 U.S.C. § 1114(1)

88.    Empower incorporates paragraphs 1 through 87, as if fully set forth herein.

89.    Empower owns the EMPOWER Registrations.

90.    The marks which are the subject of the EMPOWER Registrations are inherently distinctive, and further, U.S. Registration No. 5256647 is incontestable.

91.    EF has used and continues to use in commerce marks which are identical or confusingly similar to the marks which are the subject of the EMPOWER Registrations in connection with the sale, offering for sale, advertising and marketing of financial products and services, and which use is likely to cause confusion, or to cause mistake or to deceive, in violation of the Lanham Act, 15 U.S.C. § 1114.

92.    Empower has been, and will continue to be, damaged by EF's acts of infringement in an amount to be determined at trial.

93.    EF's acts have been committed with knowledge of Empower's exclusive rights and goodwill in the EMPOWER Registrations.

94.   Upon information and belief, EF's conduct is willful, deliberate, intentional and in bad faith.

95.   As a result of EF's acts, EF caused, and will continue to cause, irreparable harm to Empower and to the goodwill associated with the marks that are the subject of the EMPOWER Registrations.  Empower has no adequate remedy at law and is entitled to injunctive and other relief.

### COUNT TWO
### *Federal Unfair Competition*
15 U.S.C. § 1125(a)(1)(A)

96.   Empower incorporates paragraphs 1 through 95 as if full set forth herein.

97.   Empower owns the EMPOWER Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Marks.

98.   The EMPOWER Marks are inherently distinctive and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

99.   EF has and continues to use in commerce marks which are identical or confusingly similar to the EMPOWER Marks in connection with the sale, offering for sale, advertising and marketing of financial products and services, which use is likely to cause confusion, or to cause mistake or to deceive as to the affiliation, connection or association of EF with Empower or as to the origin, sponsorship or approval of EF's services or commercial activities by Empower, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

100.  Upon information and belief, EF's conduct is willful, deliberate, intentional and in bad faith.

101. As a result of EF's acts, EF caused, and will continue to cause, irreparable harm to Empower and to the goodwill associated with the EMPOWER Marks.  Empower has no adequate remedy at law and is entitled to injunctive and other relief.

## COUNT THREE
### *Common Law Trademark Infringement Under Colorado Law*

102. Empower incorporates paragraphs 1 through 101 as if full set forth herein.

103. Empower owns the EMPOWER Common Law Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Common Law Marks.

104. The EMPOWER Common Law Marks are inherently distinctive and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

105. Empower has established goodwill associated with its EMPOWER Common Law Marks, and EF is trading upon Empower's goodwill therein through the unauthorized and unlicensed use of marks which are identical or confusingly similar to the EMPOWER Common Law Marks.

106. EF's intentional, unauthorized use of marks which are identical or confusingly similar to the EMPOWER Common Law Marks in connection with the sale, offering for sale, advertising and marketing of its financial products and services is likely to cause confusion, or to cause mistake or to deceive, in violation of Colorado common law.

107. EF's intentional, unauthorized use of marks which are identical or confusingly similar to the EMPOWER Common Law Marks in connection with the sale, offering for sale, advertising and marketing of financial products and services constitutes infringement of Empower's preexisting, superior and longstanding common law rights in the EMPOWER Common Law Marks, which Empower acquired in good faith.

108.  EF has willfully, deliberately, maliciously, intentionally, knowingly and in bad faith violated – and continues to violate – Empower's common law rights in the EMPOWER Common Law Marks.

109.  As a result of EF's acts, EF caused, and will continue to cause, irreparable harm to Empower and to the goodwill associated with the EMPOWER Common Law Marks.  Empower has no adequate remedy at law and is entitled to injunctive and other relief.

### COUNT FOUR
***Common Law Unfair Competition Under Colorado Law***

110.  Empower incorporates paragraphs 1 through 109 as if full set forth herein.

111.  Empower owns the EMPOWER Common Law Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Common Law Marks.

112.  The EMPOWER Common Law Marks are inherently distinctive and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

113.  Empower has established goodwill in its EMPOWER Common Law Marks, and EF is trading upon Empower's goodwill therein through the unauthorized and unlicensed use of marks which are identical to or confusingly similar with the EMPOWER Common Law Marks.

114.  EF has misappropriated the EMPOWER Common Law Marks in connection with use of identical or confusingly similar marks in connection with financial products and services, and in order to exploit and trade off Empower's goodwill and reputation in the market.

115. EF's conduct, including as described above, has caused and will continue to cause mistake or confusion or to deceive as to the affiliation, connection, and/or association of EF with Empower or as to the origin, sponsorship or approval of EF's services or commercial activities,

and/or as to the nature and quality of EF's infringing services, in violation of Colorado common law.

116.  Upon information and belief, EF's unfair and unlawful conduct, including as described above, was deliberate, knowing and in willful disregard of Empower's intellectual property rights.

117.  EF's intentional and willful actions set forth above constitute unlawful "passing off" under Colorado unfair competition common law.

118.  EF's actions have caused and will continue to cause irreparable injury to Empower and have resulted and will continue to result in unjust enrichment of EF unless EF is restrained and/or enjoined by the Court from further violations of Empower's rights.

119.  As a result of EF's acts, EF has caused, and will continue to cause, irreparable harm to Empower and the goodwill associated with the EMPOWER Common Law Marks.  Empower has no adequate remedy at law, and is entitled to injunctive and other relief.

## COUNT FIVE
### *Deceptive Business Practices Under Colorado Law*
Colo. Rev. Stat. § 6-1-105

120.  Empower incorporates paragraphs 1 through 119 as if full set forth herein.

121.  Empower owns the EMPOWER Marks, which are uniquely associated with Empower as the source of the products and services offered in connection with the EMPOWER Marks.

122.  The EMPOWER Marks are inherently distinctive, and have additionally acquired distinctiveness by virtue of Empower's widespread use of and investment therein.

123.  Empower has established goodwill associated with the EMPOWER Marks, and EF is trading upon Empower's goodwill therein through unauthorized and unlicensed use of marks which are identical to or confusingly similar with the EMPOWER Marks.

124.  In the course of EF's business, EF has used deceptive representations and advertising and marketing practices in connection with its products and services by using marks which are identical or confusingly similar to the EMPOWER Marks.

125.  EF is knowingly making a false representation as to the source, sponsorship, approval or certification of its products and services through its unauthorized use of marks which are identical or confusingly similar to the EMPOWER Marks.

126.  Further, EF is knowingly making a false representation as to affiliation, connection or association with or certification by Empower through its unauthorized use of marks which are identical or confusingly similar to the EMPOWER Marks.

127.  Additionally, EF is knowingly passing off its products and services as those of Empower through its use of marks which are identical or confusingly similar to the EMPOWER Marks without authorization from Empower.

128.  EF uses such deceptive representations and advertising and marketing practices with the intent to induce consumers to transact with EF under the mistaken impression that EF is affiliated with, connected to, or associated with Empower.

129.  EF's intentional and willful actions set forth above constitute unlawful and deceptive business practices under Colo. Rev. Stat. § 6-1-105.

130.  EF's actions have caused and will continue to cause irreparable injury to Empower and have resulted in and will continue to result in unjust enrichment of EF unless EF is restrained and/or enjoined by the Court from further violations of Empower's rights.

131.  As a result of EF's acts, EF has caused and will continue to cause irreparable harm to Empower and the goodwill associated with the EMPOWER Marks, for which Empower has no adequate remedy at law.  Empower is thus entitled to injunctive and other relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Empower prays for the following relief from this Court:

A.    Enter judgment in favor of Empower and against EF on all counts.

B.    Permanently enjoin EF from directly or indirectly engaging in any further trademark infringement, unfair competition, or deceptive business practices against Empower, and from aiding, abetting, encouraging or inducing another to do so.

C.    Order an accounting and order EF to pay over to Empower:

     i.    All monetary gains, profits, and advantages derived by EF for the acts complained of herein;

     ii.    Damages incurred by Empower, including enhanced damages (up to treble damages) as authorized by 15 U.S.C. § 1117;

     iii.    Punitive and exemplary damages to be determined by the Court after a full hearing on the merits; and

     iv.    Empower's costs and disbursements in this action, including reasonable attorneys' fees and prejudgment and post-judgment interest.

D.    Award Empower any other or further relief that the Court deems just or appropriate.

## **JURY DEMAND**

Empower demands a trial by jury on all issues so triable.

Respectfully submitted this 9th day of January, 2023.

**HOGAN LOVELLS US LLP**

/s/ *Michael C. Theis*
Michael C. Theis
(Colorado Bar No. 17079)
HOGAN LOVELLS US LLP
1601 Wewatta Street, Suite 900
Denver, Colorado 80202
Tel.: (303) 899-7300
Fax: (303) 899-7333
michael.theis@hoganlovells.com

Anna Kurian Shaw
Lauren B. Cury
Hadley Dreibelbis
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910
anna.shaw@hoganlovells.com
lauren.cury@hoganlovells.com
hadley.dreibelbis@hoganlovells.com

Rebecca Horton
HOGAN LOVELLS US LLP
4 Embarcadero Center, Suite 3500
San Francisco, California 94111
Tel.: (415) 374-2300
Fax: (415) 374-2499
rebecca.horton@hoganlovells.com

*Attorneys for Plaintiff Empower*
*Annuity Insurance Company of*
*America*